UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
MITCHELL STERN,

                      Plaintiff,

        -against-

P.O. GEORGE SHAMMAS, P.O. DANIEL
CASTILLO, DEPUTY SHERIFF SERGIO
BOCANUMENTH, and
DEPUTY SHERIFF DENISE SHENTON,

                   Defendants.
------------------------------------------------------------------X

**MEMORANDUM & ORDER**

**12-CV-5210 (NGG) (RER)**

NICHOLAS G. GARAUFIS, United States District Judge.

This action, brought by Plaintiff Mitchell Stern pursuant to 42 U.S.C. § 1983, arises from

Plaintiff's arrest during an incident that occurred on December 16, 2009. The court assumes

familiarity with Plaintiff's allegations and the court's pre-trial decisions. See generally Stern v.

Shammas, No. 12-CV-5210 (NGG) (RER), 2015 WL 4530473 (E.D.N.Y. July 1, 2015)

(addressing motions in limine); Stern v. City of New York, No. 12-CV-5210 (NGG)

(RER), 2015 WL 3827653 (E.D.N.Y. May 21, 2015) (granting Defendants' motion for summary

judgment on Monell claim); Stern v. City of New York, No. 12-CV-5210 (NGG) (RER), 2015

WL 918754 (E.D.N.Y. Feb. 9, 2015) (denying Defendants' motion to dismiss Monell claim).

The case proceeded to trial, during which Plaintiff asserted claims of false arrest and

excessive force. At the close of the defense case, the court denied Plaintiff's motion for a

directed verdict on the issue of probable cause to arrest.[1] (See July 21, 2015, Min. Entry.) On

July 22, 2015, after seven days of trial, including deliberations, the jury rendered a verdict in

favor of Defendants George Shammas, Daniel Castillo, Sergio Bocanumenth, and Denise

---

[1] The court also denied Defendants' motions for judgment as a matter of law. (See July 16, 2015, Min. Entry;
July 21, 2015, Min. Entry.)

Shenton (together, "Defendants") on both of Plaintiff's claims. (See Jury Verdict Sheet (Dkt. 169).)

Plaintiff now renews his motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 and, in the alternative, moves for a new trial pursuant to Federal Rule of Civil Procedure 59(a)(1)(A). (See Not. of Mot. (Dkt. 173); Pl.'s Mem. of Law in Support of R. 50(b) Mot. and R. 59(a)(1)(A) Mot. ("Pl.'s Mem.") (Dkt. 173-1); Pl.'s Reply Mem. of Law in Further Supp. of R. 50(b) Mot. and R. 59(a)(1)(A) Mot. ("Pl.'s Reply") (Dkt. 178).) Defendants oppose both of Plaintiff's motions. (See Defs.' Mem. of Law in Opp'n to Pl.'s Post-Trial Mots. ("Defs.' Mem.") (Dkt. 177).) For the reasons set forth below, Plaintiff's motions are DENIED.

## I. LEGAL STANDARDS

Federal Rule of Civil Procedure 50 "imposes a heavy burden on a movant, who will be awarded judgment as a matter of law only when 'a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'" Cash v. County of Erie, 654 F.3d 324, 333 (2d Cir. 2011) (quoting Fed. R. Civ. P. 50(a)(1)). "That burden is particularly heavy where . . . the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." Id. (internal quotation marks and citation omitted). "In such circumstances, a court may set aside the verdict only if there exists such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so overwhelming that reasonable and fair minded persons could not arrive at a verdict against it." Id. (internal quotation marks and citation omitted). "[I]n entertaining a motion for judgment as a matter of law, the court should review all of the evidence in the record. In doing so, however, the court must draw all reasonable

2

inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000) (citations omitted).

"The standard for granting a new trial under Rule 59 is less stringent, but still relatively high." Starr Indem. & Liab. Co. v. Am. Claims Mgmt., No. 14-CV-0463 (JMF), --- F. Supp. 3d ---, 2015 WL 5474069, at *2 (S.D.N.Y. Sept. 17, 2015) (citation omitted). "[F]or a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." Manley v. AmBase Corp., 337 F.3d 237, 245 (2d Cir. 2003) (internal quotation marks and citations omitted). "While a judge evaluating a motion for a new trial may weigh witness credibility, he or she must do so 'with caution and great restraint, as a judge should rarely disturb a jury's evaluation of a witness's credibility and may not freely substitute his or her assessment of the credibility of witnesses for that of the jury simply because the judge disagrees with the jury.'" Starr Indem., 2015 WL 5474069, at *2 (quoting Raedle v. Credit Agricole Indosuez, 670 F.3d 411, 418 (2d Cir. 2012)). "In fact, the Court of Appeals has cautioned that 'where . . . a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case, to correct a seriously erroneous result, or to prevent a miscarriage of justice.'" Id. (quoting Raedle, 670 F.3d at 418-19). Among the grounds for granting a new trial under Rule 59 is a finding that a jury instruction was erroneous, and that the error was not harmless. See, e.g., Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 116 (2d Cir. 2000).

## II.  DISCUSSION

The court addresses each of Plaintiff's arguments in turn.  These arguments primarily concern the law of probable cause to arrest for disorderly conduct, and Plaintiff's request for an adverse inference instruction concerning video footage of the incident in question.

### A.  Evidence of Probable Cause to Arrest Plaintiff for Disorderly Conduct

Plaintiff first renews his motion for judgment as a matter of law with respect to whether probable cause existed to arrest Plaintiff for disorderly conduct.  (Pl.'s Mem. at 8-17.) Defendants argue in response that, drawing all inferences in favor of Defendants and giving deference to all credibility determinations reached by the jury, Plaintiff's behavior constituted disorderly conduct, and Defendants therefore had probable cause to arrest.[2]  (Defs.' Mem. at 5-11.)

---

[2] Defendants do not move for judgment as a matter of law with respect to whether Defendants had probable cause to arrest Plaintiff for obstruction of governmental administration ("OGA"), N.Y. Penal Law § 195.05.  Indeed, the jury reasonably could have concluded that there was probable cause to arrest for OGA based on the testimony of several witnesses that Plaintiff impeded the towing of his automobile by entering the vehicle while it was attached to the tow truck and by refusing to exit the vehicle.  See also infra n.6.  "A Fourth Amendment claim turns on whether probable cause existed to arrest for any crime, not whether probable cause existed with respect to each individual charge."  Marcavage v. City of New York, 689 F.3d 98, 109 (2d Cir. 2012).  "Accordingly, Defendants prevail if there was probable cause to arrest Plaintiff[] for any single offense."  Id. at 109-10.  Consistent with this authority, the court instructed the jury that "[i]t is not necessary to show that there was probable cause for each possible offense.  A defendant need only have probable cause to believe that the plaintiff was committing or had committed an offense or crime. . . . You do not have to be unanimous on which offense or offenses you find there to have been probable cause.  You only need to be unanimous that probable cause existed for any offense."  (Jury Instructions (Ct.'s Ex. 3 (Dkt. 160)) at 15-16, 17-18 (emphasis in original).)  The verdict sheet, however, did not require the jury to state whether Defendants had probable cause to arrest for each of the two offenses on which the court provided instructions: OGA and disorderly conduct.  Rather, the verdict sheet simply asked the jury to determine whether Plaintiff proved that he was falsely arrested.  (See Jury Verdict Sheet at 1.)  Accordingly, the court cannot state with certainty whether the jury unanimously found that Defendants had probable cause to arrest for OGA, or whether the verdict was based on probable cause to arrest for disorderly conduct, or whether it was based on probable cause to arrest for both.  At no time before trial, during trial, or after the jury returned its verdict did any party request that the court ask the jury to identify whether it unanimously found that there was probable cause to arrest for each of the two offenses, for one of the two offenses, or for neither of the offenses.  (See, e.g., Pl.'s Proposed Verdict Sheet (Dkt. 134-1); Defs.' Proposed Verdict Sheet (Dkt. 130-1).)

In addition, although the court and the parties contemplated submitting special interrogatories to the jury for the purposes of aiding the court in its potential qualified immunity analysis (see Answer to First Am. Compl. (Dkt. 81) at 9 (asserting qualified immunity defense)), no party requested that the court submit the special interrogatories after the jury returned a complete verdict in favor of Defendants.  The court has not performed a qualified immunity analysis in this action and does not perform one in this Memorandum and Order.

1.    <u>Legal Standard</u>

A person commits disorderly conduct if, "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," he engages in one of seven enumerated descriptions of unlawful behavior. N.Y. Penal Law § 240.20. Accordingly, to establish disorderly conduct under New York law, "the prosecution must establish three elements: (i) the defendant's conduct must be 'public' in nature, (ii) it must be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." <u>Provost v. City of Newburgh</u>, 262 F.3d 146, 157 (2d Cir. 2001).

With respect to the first element (conduct of a public nature), "[t]he New York disorderly conduct statute punishes 'disruptive behavior . . . of public rather than individual dimension.'" <u>Id.</u> at 157 (quoting <u>People v. Munafo</u>, 406 N.E.2d 780, 783 (N.Y. 1980)). "The clear aim was to reserve the disorderly conduct statute for situations that carr[y] beyond the concern of individual disputants to a point where they . . . become a potential or immediate public problem." <u>Id.</u> (alteration in original) (quoting <u>Munafo</u>, 406 N.E.2d at 783). "In assessing whether an act carries public ramifications, relevant factors to consider are the time and place of the episode under scrutiny; the nature and character of the conduct; the number of other people in the vicinity; whether they are drawn to the disturbance and, if so, the nature and number of those attracted; and any other relevant circumstances." <u>People v. Weaver</u>, 944 N.E.2d 634, 636 (N.Y. 2011). Still, "there is no per se requirement that members of the public must be involved or react to the incident. . . . [A] defendant may be guilty of disorderly conduct regardless of whether the action results in public inconvenience, annoyance or alarm if the conduct recklessly creates a risk of such public disruption." <u>Id.</u>

5

With respect to the second element (the individual's intent), "[a]n assessment of intent frequently depends on circumstantial evidence." Zalaski v. City of Hartford, 723 F.3d 382, 393 (2d Cir. 2013) (discussing probable cause to arrest for violation of Connecticut's disorderly conduct statute). "[U]nlike at trial, where circumstantial evidence must support a finding of culpable intent beyond a reasonable doubt, a probable cause determination . . . can be made on 'substantially less' evidence. Id. (citations omitted). "[B]ecause the practical restraints on police in the field are greater with respect to ascertaining intent . . . , the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." Id. (internal quotation marks and citation omitted). In addition, New York law does not impose any requirement on an arresting officer to credit "independent evidence of" an individual's intent to disturb the peace before arresting the individual. United States v. Nelson, 500 F. App'x 90, 94 (2d Cir. 2012) (summary order) (discussing People v. Jones, 878 N.E.2d 1016 (N.Y. 2007)).

Finally, with respect to the third element (enumerated forms of unlawful behavior), the court instructed the jury in this action on three of the statute's enumerated descriptions of disorderly conduct: (1) "engag[ing] in fighting or in violent, tumultuous or threatening behavior"; (2) "mak[ing] unreasonable noise"; and (3) "[i]n a public place, us[ing] abusive or obscene language, or mak[ing] an obscene gesture." N.Y. Penal Law § 240.20(1)-(3). It does not appear that the New York Court of Appeals has commented on the meaning of "violent, tumultuous or threatening behavior," and the court construes these words according to their plain meanings. "Abusive or obscene language" is not unlawful if it is constitutionally protected speech, and with respect to words directed at police officers, language is only unlawful when it contains "[f]ighting words [that] tend to incite an immediate breach of the peace." Provost, 262

6

F.3d at 159-160 (quoting Posr v. Court Officer Shield No. 207, 180 F.3d 409, 415 (2d Cir. 1999) (emphasis in original)); see also Posr, 180 F.3d at 415-16 (holding that plaintiff adequately alleged that officers lacked probable cause to arrest for disorderly conduct in the form of "threatening" behavior where plaintiff allegedly stated, while backing away from officer, "One day you're gonna get yours"). Finally, "[t]he term 'unreasonable noise' means 'a noise of a type or volume that a reasonable person, under the circumstances, would not tolerate.'" Provost, 262 F.3d at 159 (quoting People v. Bakolas, 449 N.E.2d 738, 740 (N.Y. 1983)).

    2.    Discussion

Here, the court concludes that there was a legally sufficient evidentiary basis for a reasonable jury to conclude that Defendants had probable cause to arrest Plaintiff for disorderly conduct.[3] During the trial, several witnesses testified that Plaintiff conducted himself in a highly disruptive, aggressive, and confrontational manner that, at the very least, recklessly created a risk of public inconvenience, annoyance, or alarm. According to these witnesses, Plaintiff's conduct, which occurred on a public street and in the presence of the third-party tow truck operators, lasted for a significant length of time (more than mere seconds or minutes) and made Defendants fear for the safety of Nicole Sawler. Also according to these witnesses, while Defendants attempted to diffuse the situation by offering Plaintiff alternatives to the towing of his vehicle (such as accepting payment in the field, and telling Plaintiff that if the tow turned out to be in error, his payment would be refunded), Plaintiff instead escalated the situation by refusing to exit his vehicle while it was attached to the tow truck, making threats about the officers' jobs, and yelling and cursing. This is legally sufficient evidence to support the jury's determination in this § 1983 action—in which Defendants need only prove by a preponderance of the evidence that

---

[3] As discussed above, Plaintiff does not challenge whether there was legally sufficient evidence for the jury to conclude that Defendants had probable cause to arrest Plaintiff for obstruction of governmental administration.

they had probable cause to arrest (as opposed to a criminal action in which the prosecution must prove beyond a reasonable doubt that the defendant engaged in disorderly conduct).

Plaintiff argues that witnesses merely testified to an "agitated, loud arrestee," which although "personally offensive" to Defendants, could not allow a reasonable jury to find that Plaintiff created a public inconvenience or recklessly disregard a risk thereof. (Pl.'s Mem. at 9-11; see also id. at 12-14.) This argument fails for two reasons. First, as discussed above, the evidence, viewed in the light most favorable to Defendants, supports a jury determination that Plaintiff at least acted with reckless disregard to the risk of public inconvenience, annoyance, or alarm, even if "public" inconvenience, annoyance, or alarm did not ensue. See People v. Todaro, 258 N.E.2d 711, 713 (N.Y. 1970) (explaining that the statute criminalizes the reckless creation of a risk of public inconvenience, annoyance, or alarm, even where the public inconvenience does not occur); People v. Diaz, 868 N.Y.S.2d 861, 863 (N.Y. Crim. Ct. 2008) ("A loud and violent confrontation with the police in a residential neighborhood late at night carries the potential of [public disturbance]. Whether or not the defendant's conduct actually caused a public inconvenience is irrelevant to a Disorderly Conduct charge."). Second, Plaintiff fails to cite any case law supporting the argument that Plaintiff's conduct—while on a public street, responding to the officers and tow truck operators in an angry manner, cursing at the officers and tow truck operators, threatening the officers' jobs, refusing to leave his car while it was attached to the tow truck, and acting in a manner that made Defendants fear for Ms. Sawler's safety—does not allow a jury to infer that Defendants had probable cause to believe that Plaintiff acted with the requisite mental state, or that the dispute was "public" in nature. Cf., e.g., People v. Baker, 984 N.E.3d 902, 907 (N.Y. 2013) (public harm element lacking, and therefore no probable cause to arrest, where, while walking away from an officer, defendant

made two abusive statements, outburst lasted only fifteen seconds, and the statements were not paired with any menacing conduct). In other words, viewing the evidence in the light most favorable to Defendants, the December 16, 2009, confrontation was not an interaction in which Plaintiff made only "isolated statements using coarse language to criticize the actions of a police officer, unaccompanied by provocative acts or other aggravating circumstances." See id. at 908.

Second, Plaintiff argues that constitutional limitations make a disorderly conduct charge impossible as a matter of law, and therefore Defendants lacked probable cause to arrest. (See Pl.'s Mem. at 11-12.) Although Plaintiff did request a jury instruction addressing constitutionally protected speech (which the court rejected, see infra Part II.B), his defense of his conduct during trial was not based on such a theory. In other words, Plaintiff did not, in an effort to justify his alleged conduct at trial, admit that he acted in an agitated manner, yelled and cursed at the police, refused to exit his vehicle, and threatened the officers' jobs. Rather, Plaintiff disputed Defendants' version of events, and asked the jury instead to conclude that he acted in a reasonable, appropriate manner. Below are several examples of Plaintiff's testimony:

> MR. FRANCOLLA: You didn't raise your voice to either of the sheriffs?
>
> PLAINTIFF: Absolutely not.
>
> *    *    *
>
> MR. FRANCOLLA: But it's your testimony to this jury that there was absolutely no reason for anyone to call for help; right?
>
> PLAINTIFF: No, because everybody was getting back in their car.
>
> MR. FRANCOLLA: And you weren't angry at [] Bocanumenth?
>
> PLAINTIFF: Absolutely not.
>
> MR. FRANCOLLA: You weren't angry at this tow truck driver?

PLAINTIFF: No. As professional as they always was [sic].

MR. FRANCOLLA: You were totally cooperative with the towing process; right?

PLAINTIFF: Yes, I was.

MR. FRANCOLLA: At no point, did you so much as raise your voice?

PLAINTIFF: No.

MR. FRANCOLLA: You didn't try and drive your car off the tow truck, did you?

PLAINTIFF: No. The only time I raised my voice was when I spoke to Shammas.

\*　　\*　　\*

PLAINTIFF: I didn't ask them to put the car down. I sat there very professional until I started getting yelled at by the officer.

(Tr. at 184:2-3, 185:19-186:10, 198:16-18.) Plaintiff cannot use his post-trial memorandum of law to recast the story from the one to which he testified (essentially, "I did not engage in the conduct Defendants and other witnesses now accuse me of") to a new version in which he argues that he did engage in such conduct, but that it was constitutionally protected. See also infra Part II.B.

Moreover, the two Second Circuit decisions on which Plaintiff substantially relies for his constitutional arguments are distinguishable. In Posr, the defendant-officer refused to check the plaintiff's bicycle pump at the entrance of a courthouse; the plaintiff questioned the decision, and the officer asked the plaintiff whether he wanted to be arrested; the plaintiff responded that he did not want to be arrested, and as he was moving away from the officer, stated "One day you're gonna get yours," and was subsequently arrested. 180 F.3d at 413. Reversing the district court's decision granting the defendant's motion to dismiss for failure to state a claim for false arrest, the

Second Circuit explained that, as pleaded, it was unlikely that the plaintiff's statement could have been deemed by the officers to be "fighting words," and therefore dismissal for failure to state a claim was improper. Id. at 415-16. Here, the court must view the trial record in the light most favorable to Defendants, as opposed to accepting as true the allegations in a complaint, as the Second Circuit did in Posr. And, unlike in Posr, where the court concluded that the plaintiff plausibly stated a claim by alleging there was no probable cause to arrest when he made a vague verbal threat while walking away from the officer, Plaintiff here engaged in a lengthy confrontation with the officers and tow truck operators, escalated that confrontation on a number of occasions, failed to follow Defendants' instructions, and created an atmosphere in which Defendants feared for Ms. Sawler's safety.

In Provost, the plaintiff was charged with disorderly conduct after a confrontation that occurred at a police station; during the confrontation, the plaintiff grew angry after having waited an hour to see an officer, banged on the bulletproof glass separating citizens from the attending officer, yelled at the officer, and stated, inter alia, "I can't sit around on my fat ass all day like you." 262 F.3d at 151. The jury concluded that there was no probable cause to arrest for disorderly conduct, and one of the officers thereafter moved for judgment as a matter of law. Id. at 156. The Second Circuit rejected the officer's challenge and upheld the verdict, explaining that the jury reasonably could have concluded that "hollering and yelling through the window was for the legitimate purpose of getting the desk officer's attention, not to cause public inconvenience, annoyance or alarm," particularly in light of the defendants' testimony that the only way to get an officer's attention on the other side of the partition was to raise one's voice. Id. at 158 (alterations and internal quotation marks omitted). With respect to whether the plaintiff made unreasonable noise, the court held that a reasonable jury could have found that the

11

level of noise was not unreasonable. Id. at 159. And with respect to whether the plaintiff used abusive or obscene language, the court held that even if the jury believed the officers' account of the confrontation, such words would not be "fighting words" and would not tend to incite an immediate breach of the peace. Id. at 159-60. Here, unlike in Provost, none of the Defendants admitted in testimony that they knew of a legitimate basis for Plaintiff's conduct; accordingly, the key holding in Provost—concerning the lack of probable cause to arrest where an officer knows of an arrestee's legitimate intent—does not apply here.

Third, Plaintiff argues that his conduct does not satisfy any of the enumerated types of disorderly conduct on which the court instructed the jury. (Pl.'s Mem. at 14-16.) The court disagrees. Viewing the evidence in the light most favorable to Defendants, a reasonable jury could find that Defendants had probable cause to believe that Plaintiff—with the requisite intent and in a public setting—made unreasonable noise, used abusive or obscene language, or engaged in violent, tumultuous, or threatening behavior. First, a jury could conclude that there was probable cause to arrest based on a finding that prolonged yelling and cursing during the early morning hours in a residential neighborhood constitutes "unreasonable noise." See, e.g., Bakolas, 449 N.E.2d at 739-40 (rejecting constitutional challenge to unreasonable noise provision, and affirming denial of motion to dismiss criminal information that charged that one "defendant was stopped for a traffic violation and then became abusive to officer, yelling, threatening" and another defendant was observed "standing in the westbound traffic lane of Monroe Ave. yelling at Officer Trite"); see also Provost, 262 F.3d at 159 (describing the jury's role in determining what level of noise is "unreasonable"). Second, a jury could conclude that there was probable cause to arrest based on a finding that Plaintiff used obscene or abusive language. See, e.g., People v. Tichenor, 658 N.E.2d 606, 610 (N.Y. 1997) (rejecting the

12

defendant's argument "that he was convicted solely on the basis of his private, tete-a-tete with the officer—albeit on a public street," and explaining that "[t]he jury had plenty of evidence to weigh the whole incident—all the connected frames—and to conclude that defendant intended to cause and incite a public disturbance" (distinguishing City of Houston v. Hill, 482 U.S. 451, 461 (1987)); People v. Welch, 734 N.Y.S.2d 768, 769 (App. Div. 2001) (holding that officer had probable cause to arrest the defendant for disorderly conduct because, inter alia, "when he sought to question defendant about his identity and presence in the alleyway, defendant became very loud and abusive and began using obscene language . . ."). Finally, a jury could conclude that there was probable cause to arrest based on a finding that Plaintiff's conduct—which included running, screaming, and making threats to the officers' jobs, could not be controlled verbally by the officers, and resulted in Ms. Sawler fearing for her safety—constituted tumultuous or threatening behavior. See, e.g., Diaz, 868 N.Y.S.2d at 864 (denying motion to dismiss as facially insufficient disorderly conduct charge premised on violent, tumultuous, or threatening behavior where the defendant's "alleged loud and combative conduct directed at the police was confrontational and likely to cause precisely the kind of public disturbance that the statute is intended to prevent").

For these reasons, the court finds that, assuming the jury reached its probable cause determination on the disorderly conduct charge (as opposed to the charge of obstruction of governmental administration ("OGA")), there was legally sufficient evidence for the jury to find for Defendants on that issue.

**B.      The Court's Jury Instruction Regarding Disorderly Conduct**

In addition to arguing that Defendants lacked probable cause to arrest Plaintiff for disorderly conduct as a matter of law, Plaintiff argues that the court erred in its instruction to the

13

jury on this issue. (Pl.'s Mem. at 17-19.) Defendants respond that the instruction was proper. (Defs.' Mem. at 11-12.)

### 1. Legal Standard

"[A] jury instruction will be deemed adequate, so long as the charge, taken as a whole, is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." Care Travel Co. v. Pan Am. World Airways, Inc., 944 F.2d 983, 998 (2d Cir. 1991) (internal quotation marks and citations omitted). "Thus, perfection is not expected." Id. "Moreover, a trial court has discretion in the style and wording of jury instructions." Id. However, "[a] jury charge is erroneous if the instruction misled the jury as to the proper legal standard or did not adequately inform the jury of the law." Hester v. BIC Corp., 225 F.3d 178, 186 (2d Cir. 2000). "A court's charge must be tested by viewing it as a whole and will not be disturbed if it is correct and sufficiently covers the case so that a jury can intelligently determine the questions presented to it." Pahuta v. Massey-Ferguson, Inc., 170 F.3d 125, 135 (2d Cir. 1999) (internal quotation marks and citation omitted). "An erroneous instruction, unless harmless, requires a new trial." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994).

### 2. The Jury Instruction

With respect to the crime of disorderly conduct, the court instructed the jury as follows:

> A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: he engages in fighting or in violent, tumultuous or threatening behavior; or he makes unreasonable noise; or in a public place, he uses abusive or obscene language, or makes an obscene gesture.
>
> Please refer to the definitions of "intent" and "recklessly" that I have already provided.
>
> "Public inconvenience" means a breach of the peace that is public in nature, causing inconvenience, annoyance, or alarm to a

> substantial segment of the public, or conduct that becomes a
> potential or immediate public problem. A public inconvenience
> does not have to actually affect members of the public. Instead,
> under the statute, an individual need only recklessly create "a risk"
> of public inconvenience, annoyance, or alarm.

(Jury Instructions (Ct.'s Ex. 3 (Dkt. 160)) at 17.)

The court rejected several additions proposed by Plaintiff during the charge conference.[4]

(See July 21, 2015, Min. Entry; Pl.'s Proposed Charge on Disorderly Conduct ("Pl.'s Proposal")

(Ct.'s Ex. 6 (Dkt. 165)).) These proposals included instructions that (1) in determining

Plaintiff's intent, the jury could consider "any justifiable reason that the plaintiff may have had

for his conduct" (citing Provost, 262 F.3d at 158); (2) defined "violent, tumultuous or threatening

behavior" (citing two New York cases from trial-level criminal courts, and one case from the

Vermont Supreme Court); (3) defined "unreasonable noise" and explained that "[c]hallenging

police action is sufficient reason for making noise" (citing City of Houston v. Hill, 482

U.S. 451, 462-63 (1987); Provost, 262 F.3d at 159); and (4) explained that speech towards law

enforcement officers is constitutionally protected, and therefore to be unlawful must have "a

direct tendency to provoke the police officer to retaliate with acts of violence or other breaches

of the peace" (citing Provost, 262 F.3d at 159-60; Posr, 180 F.3d at 415). (Pl.'s Proposal at 1-2.)

### 3. Discussion

For many of the same reasons discussed above, see supra Part II.A, the court finds that

the jury instruction on the disorderly conduct offense was adequate. The charge, taken as a

---

[4] In his initial request to charge, Plaintiff only included the underlying crimes of OGA and resisting arrest, and therefore did not include any request to charge with respect to the crime of disorderly conduct. (Pl.'s Proposed Jury Instructions (Dkt. 132) at 5.) Defendants included the crime of disorderly conduct in their initial request to charge, submitted the same day as Plaintiff's. (See Defs.' Request to Charge (Dkt. 129) at 15.) Accordingly, the charge conference was arguably Plaintiff's first opportunity to put forward a substantive proposal on the disorderly conduct charge.

whole, instructed the jury on each element of the disorderly conduct offense, and separately instructed the jury on the law of probable cause.[5]

With respect to the disorderly conduct jury instruction, Plaintiff focuses on his constitutional argument—which, as discussed above, was not his core defense at trial. A district court faced a similar challenge in <u>Potenza v. Gonzales</u>, Nos. 07-CV-225, 07-CV-226, 2011 WL 484195, at *1-2 (N.D.N.Y. Feb. 7, 2011). There, a jury returned a verdict in favor of the defendant on the plaintiffs' false arrest claim, based on the defendant's probable cause to arrest the plaintiffs for disorderly conduct for an incident that involved, inter alia, the use of obscene language and/or obscene gestures. The plaintiffs argued in their post-trial motion "that their speech did not constitute fighting words, was constitutionally protected and, therefore, could not have been the basis for a lawful arrest" and argued "that the Court should have instructed the jury that the use of profanity alone is an insufficient basis upon which to arrest someone for violating N.Y. Penal Law § 240.20." <u>Id.</u> at *1. The court rejected the plaintiffs' argument, finding that the failure to give an instruction on First Amendment principles did not cause a seriously erroneous result or lead to a miscarriage of justice. <u>Id.</u> Moreover, the court distinguished <u>Provost</u>, in which the defendant had conceded at trial that there was a legitimate purpose for plaintiff raising his voice and banging on the glass inside a police station (namely, the glass made it hard for officers inside the partition to hear speakers on the other side), holding that "it was reasonable for the jury to conclude that Defendant believed Plaintiffs to be acting with the intent necessary to violate the disorderly conduct statute and that Plaintiffs' actions went beyond mere speech and also engaged in aggressive and/or threatening behavior." <u>Id.</u> In short, "[t]hrough the jury's specific findings, and its ultimate verdict, the jury assessed Plaintiffs' conduct, addressed the elements of the disorderly conduct statute, and found them to be satisfied

---

[5] Plaintiff does not challenge the court's general instruction on the law of probable cause to arrest.

(or at least found that Defendant had probable cause to believe Plaintiffs violated the statute)." Id. at *2 (footnote omitted). Accordingly, "[b]ecause the jury was asked to consider, and decided, the issues concerning the circumstances surrounding Plaintiffs' words and conduct and found Plaintiffs to have acted with the intent necessary to invoke the disorderly conduct statute, the Court [saw] no reason to disturb the jury's verdict." Id.

The same is true here. The charge required the jury to assess whether Defendants proved by a preponderance of the evidence that they had probable cause to believe that Plaintiff had engaged in disorderly conduct. In particular, the charge required the jury to determine whether Plaintiff's conduct qualified under the three subdivisions, and whether he acted with the requisite intent to cause a public inconvenience or recklessly create a risk thereof. Based on the trial record, there was no need specifically to instruct the jury—as Plaintiff now argues—concerning "the constitutionally protected nature of Stern's speech and or the bona fide reasons that Stern had for taking the actions that he did, i.e., that he believed that the actions of the defendants was not permitted by law." (Pl.'s Mem. at 19.) Cf. Perry v. Ethan Allen, Inc., 115 F.3d 143, 153 (2d Cir. 1997) ("A party is not entitled to have the court give the jury an instruction for which there is no evidentiary predicate at trial.").

This was not a criminal trial in which the jury was asked to determine Plaintiff's guilt of engaging in disorderly conduct beyond a reasonable doubt. Moreover, Plaintiff's § 1983 trial in this action did not consist of a facial or an as-applied challenge to New York's disorderly conduct statute. Rather, this trial was a dispute between the parties concerning what actually happened on December 16, 2009. Based on the trial record, the court properly instructed the jury on the applicable underlying offenses of disorderly conduct and OGA, and, faced with widely diverging factual accounts of what occurred, the jury returned a verdict crediting Defendants'

version of events. Cf. Provost, 262 F.3d at 159 ("[A]lthough several officers testified that Provost used obscene and 'aggressive' language, Provost denied having done so. The jury was free to credit Provost's testimony and not the officers', thus concluding that probable cause was absent."); Lozada v. Weilminster, No. 11-CV-2049 (MKB), --- F. Supp. 3d ---, 2015 WL 1311174, at *8 (E.D.N.Y. Mar. 23, 2015) (denying motion for summary judgment where "Defendants contend[ed] that Plaintiff was behaving in a belligerent manner, making unreasonable noise and using obscene language" and "Plaintiff contend[ed] that she was not, and point[ed] to both her own and Defendants' testimony which indicates that Plaintiff was 'calm' and 'normal' at points throughout her short interaction with the [defendants]").

Moreover, any error in the jury charge was harmless, as the weight of the evidence introduced at trial demonstrated that Defendants had probable cause to arrest Plaintiff for OGA based on his decision to enter his car while it was hooked to the tow truck and his refusals to exit the vehicle[6] (a jury instruction and result not challenged by Plaintiff, see supra n.1), and because Plaintiff's version of the events did not actually assert that the conduct to which Defendants testified was constitutionally protected, but rather disputed that this conduct occurred in the first place. See, e.g., Brocuglio v. Proulx, 324 F. App'x 32, 34-35 (2d Cir. 2009) (summary order) (affirming district court decision that plaintiff suffered no harm from purportedly improper jury instruction because the weight of the evidence supported the finding that defendants had

---

[6] The evidence supporting a finding that Defendants had probable cause to arrest Plaintiff for OGA includes the following: (1) Ms. Sawler testified that she saw Plaintiff get into his car and close the door, and remain inside for more than ten seconds and possibly more than a minute (Tr. at 636:11-637:3); (2) Mr. Rodriguez testified that Plaintiff "came running out of the house, screaming" and, while the vehicle was attached to the tow truck and three-feet in the air, "jumped in the car to try to drive it off" (id. at 644:8-10, 659:6-20); (3) Mr. Rodriguez further testified that it took "awhile" for Defendants to get Plaintiff out of the car, and, once they did, "he stood in between the car and the truck so I still couldn't go anywhere" (id. at 645:12-14); (4) Deputy Bocanumenth testified that Plaintiff entered the vehicle without permission while it was attached to the tow truck and refused to come out (id. at 776:25-777:12, 777:19-778:16); (5) Deputy Shenton testified that Plaintiff refused the officers' orders to exit the vehicle while it was attached to the tow truck (id. at 820:15-24, 821:1-5); (6) Officer Shammas testified that Plaintiff refused several of his orders to exit the vehicle (id. at 898:1-13); and (7) Officer Castillo testified that Plaintiff was still inside the vehicle upon the arrival of the NYPD at the scene (id. at 978:23-25).

18

probable cause to arrest); Common Fund for Non-Profit Orgs. v. KPMG Peat Marwick LLP, No. 96-CV-255 (GBD), 2003 WL 1108493, at *7 (S.D.N.Y. Mar. 12, 2003) ("The jury instruction given by the Court was consistent with the theories of the parties, the evidence presented, and the law. . . . Moreover, in light of the evidence and theory of plaintiff's case, any error in giving the instruction would have been harmless."); see also, e.g., Renz v. Grey Advert., 135 F.3d 217, 223-24 (2d Cir. 1997) (finding that jury charge in employment discrimination case failed to convey the proper standard of proof, but affirming verdict because "even if correctly charged, the jury would not have found" for plaintiff, and therefore "the erroneous instruction did not substantially affect [plaintiff's] rights").

### C. The Court's Actions Concerning Video Footage of the Incident

Plaintiff argues that the court erred by rejecting his application for a spoliation finding, failing to give an adverse inference instruction, and providing a curative instruction to the jury at the close of summations. (See Pl.'s Mem. at 19-24.) Defendants respond that the court should not revisit its pre-trial rulings, and that the court's curative instruction was proper. (Defs.' Mem. at 12-14.)

#### 1. Background and Pre-Trial Rulings

Plaintiff moved in limine for a spoliation finding and an adverse inference instruction concerning purportedly missing video footage of the December 16, 2009, incident. (See Pl.'s Mem. of Law in Support of Mot. to Admit Certain Evidence at Trial (Dkt. 111) at 11-14.) In its pre-trial decision addressing the parties' motions in limine, the court denied Plaintiff's requests but permitted Plaintiff to introduce testimony at trial concerning the purportedly missing footage, including via a properly qualified expert witness. See Stern, 2015 WL 4530473, at *12-14. In other words, while the court permitted Plaintiff to present to the jury his theory that footage was

missing, the court did not find it appropriate to direct the jury to draw a particular conclusion regarding the nature of the missing material. Id. at *14.

Subsequent to the court's issuance of its decision in limine, Defendants informed the court that they believed they had located the original version of the recording of the incident (materially matching the footage already in Plaintiff's possession), and requested that the court preclude Plaintiff from introducing at trial the VHS version of the recording in his possession as well as expert testimony related to the VHS version. (See generally Pl.'s Mem. at 20-21; see also Defs.' July 2, 2015, Ltr. (Dkt. 142) at 1-2 (disclosing to the court that Defendants had located the original recording, and stating that "pending [P]laintiff's inspection of the videotape, there is no valid argument that can be made to suggest this videotape was in any way altered or that there is any missing videotape"); Pl.'s July 3, 2015, Ltr. (Dkt. 143) at 1-3 (questioning Defendants' very late disclosure of the original recording, and arguing that an examination of the original recording would show, like the examination of the VHS version, that footage was missing).) With the trial date quickly approaching, the parties conferred concerning the logistics of when and how Plaintiff's video expert, Edward J. Primeau, could examine the newly discovered, original recording. (See Defs.' July 9, 2015, Ltr. (Dkt. 152) at 2-3.) The court directed Plaintiff to make Mr. Primeau available to the court telephonically on the afternoon of July 13, 2015 (the first day of trial), for questioning by the court.[7] (See July 10, 2015, Order.)

Mr. Primeau ultimately examined the original recording[8] in advance of testifying, in addition to the VHS version that he had reviewed during the course of discovery. (Tr.

---

[7] Separately, the court directed the parties to appear in-person on the morning of July 13, 2015, before the commencement of jury selection, concerning Plaintiff's motion for sanctions against Defendants' counsel, which the court ultimately denied. (See Pl.'s July 10, 2015, Ltr. (Dkt. 153) (filed under seal); July 10, 2015, Order; Defs.' July 10, 2015, Ltr. (Dkt. 155) (filed under seal); July 23, 2015, Order (denying Plaintiff's request for sanctions).)

[8] At one point during questioning by the court outside of the jury's presence, Mr. Primeau questioned whether the version of the recording that had been located by Defendants in advance of trial and that he reviewed shortly before

at 545:13-546:10.) Upon his qualification as an expert witness pursuant to Federal Rule of Evidence 702, Mr. Primeau testified concerning his forensic evaluation of the existing footage of the incident. (See Tr. at 539-74 (voir dire outside of jury's presence), 662-87 (trial testimony).) Mr. Primeau testified "with a reasonable degree of scientific certainty" that the thirty-second recording of the tow of Plaintiff's car was "not a complete accurate representation of the events that were recorded that day." (Id. at 680:2-12.) However, Mr. Primeau could not render any opinion regarding what material was purportedly erased or lost from the recording, how much material was erased or lost, or who may have tampered with the recording. (Id. at 685:10-22.)

2. Legal Standard

As the court previously explained, "[w]here a party seeks an adverse inference instruction based on spoliation of evidence, it must show: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a "culpable state of mind" and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" Stern, 2015 WL 4530473, at *12 (quoting Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 220 (S.D.N.Y. 2003)). "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." Zubulake, 220 F.R.D. at 216 (internal quotation marks, citation, and footnote omitted). Because an adverse inference instruction is an extreme sanction, the court should hesitate to employ it. See id. at 220 ("[T]he party suffering [an adverse inference] instruction will be hard-pressed to prevail on the merits. Accordingly, the adverse inference instruction is an extreme sanction and should not be given lightly.").

---

testifying was actually the original recording. (See Tr. at 555:1-6.) The parties subsequently stipulated that the version reviewed by Mr. Primeau shortly before his testimony was, in fact, the original. (Id. at 665:4-8, 666:14-16.)

3. <u>Discussion</u>

Plaintiff now raises two, related arguments concerning the video footage. For the reasons discussed below, the court rejects both of Plaintiff's arguments.

a. *Whether an Adverse Inference Instruction Was Warranted*

First, Plaintiff argues that the evidence introduced at trial—namely, expert testimony that material was missing from the recording; testimony by the third-party videographer that she believed she recorded ten to fifteen minutes of footage, and that she delivered the original, 8-millimeter tape to Deputy Sheriff Bocanumenth; evidence that Bocanumenth's handwriting was on the tape's label; and documentary evidence, in the form of a policy and procedure governing the Department of Finance's preservation of video recordings of tows—warranted a spoliation finding and an adverse inference instruction. (See Pl.'s Mem. at 22.) The court disagrees. Considering the evidence introduced at trial and the discretion afforded to a trial court in determining whether an adverse inference instruction is warranted, the court finds that it did not err in rejecting Plaintiff's requests.

As a threshold matter, Plaintiff does not address how any trial evidence would warrant an adverse inference instruction with respect to the three Defendants other than Bocanumenth—who were never implicated in the chain-of-custody of the original recording, including two Defendants (Officers Shammas and Castillo) who were not even employees of the Department of Finance—or how an adverse inference instruction could have been tailored against Bocanumenth without unfairly prejudicing the other three Defendants.

With respect to Deputy Sheriff Bocanumenth, although his testimony concerning the recording in question was somewhat vague, he explained why his handwriting appeared on the label of the 8-millimeter recording, and explained that he did not recall how the original

recording arrived at the Department of Finance's storage library, since he escorted Deputy

Sheriff Shenton (his injured partner) from the scene of the incident directly to the hospital. (See

Tr. at 787-814.) Accordingly, Plaintiff did elicit some evidence tending to show that

Bocanumenth had custody of the original recording for at least some portion of the day in

question, although the details of such custody are vague. In addition, although the Department of

Finance policy in question can be viewed more as a directive to the Department of Finance itself

to preserve recordings (as opposed to a directive to the Department of Finance's employees),

Plaintiff did elicit some evidence tending to show that a deputy sheriff had a duty, at least

according to the terms of the policy,[9] to deliver all recordings to the Department of Finance for

preservation and safekeeping. Thus, Plaintiff arguably elicited testimony concerning whether

there was a duty to preserve the recording (independent of any other duty, such as one that may

have existed in connection with the criminal prosecution of Plaintiff associated with the incident

in question).

Plaintiff, however, failed to satisfy the third element of the adverse inference

framework—that the destroyed evidence was relevant to his claim such that a reasonable trier of

fact could find that it would support that claim or defense. It is undisputed that Plaintiff offered

absolutely no evidence that Bocanumenth intentionally or willfully destroyed evidence. Thus,

because Plaintiff apparently relied on a theory that Bocanumenth acted negligently (although

Plaintiff never characterized it this way), he must also show "that the destroyed evidence would

have been favorable to [him]." Zubulake, 220 F.R.D. at 221 (footnote omitted); see also

---

[9] No party called a representative from the Department of Finance as a witness. Accordingly, the court assumes for the purposes of this Memorandum and Order that the policy in question was, in fact, followed by the Department during the relevant time period. (But see Tr. at 812: 9-814:7 (Deputy Sheriff Bocanumenth testifying that to his knowledge, no deputy sheriff ever followed the policy's directive to sheriffs to put certain notations in memo books and no deputy sheriff ever followed the policy's directive to sheriffs to secure new recordings in a locked cabinet when videotape librarian was unavailable).)

Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 108-109 (2d Cir. 2002) ("Although we have stated that, to obtain an adverse inference instruction, a party must establish that the unavailable evidence is 'relevant' to its claims or defenses, our cases make clear that 'relevant' in this context means something more than sufficiently probative to satisfy Rule 401 of the Federal Rules of Evidence. Rather, the party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction." (internal quotation marks, citations, and footnote omitted)). "This corroboration requirement is even more necessary where the destruction was merely negligent, since in those cases it cannot be inferred from the conduct of the spoliator that the evidence would even have been harmful to him." Zubulake, 220 F.R.D. at 221 (internal quotation marks, citation, and footnote omitted). "This is equally true in cases of gross negligence or recklessness; only in the case of willful spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed." Id. (emphasis in original) (footnote omitted).

Here, Plaintiff argues that "the relevance of [the missing footage] cannot reasonably be disputed" since "the missing videotape evidence would have established beyond any doubt the key facts in this case on Stern's false arrest claim, i.e., what Stern did immediately prior to his arrest for obstruction of governmental administration." (Pl.'s Mem. at 22.) As discussed above, however, this is not the correct standard where an alleged spoliator is accused of negligent conduct as opposed to the willful destruction of evidence. That the missing footage (if it existed in the first place) may have been helpful to the jury is not the proper inquiry; rather, the question is whether Plaintiff has corroborated in some way that the missing footage supported his version of the events, and not the Defendants' version(s).

Plaintiff has not offered any such corroboration, and it was therefore proper to deny the motion for an adverse inference instruction. See, e.g., Chisholm v. Sloan-Kettering, No. 09-CV-8211 (VM), 2011 WL 2015526, at *7 (S.D.N.Y. May 13, 2011) ("Even assuming that Defendants had an obligation to preserve all of the 2007 log sheets . . . and negligently failed to do so, it cannot be inferred from that fact alone that the log sheets were favorable to [plaintiff] absent some corroboration."); Treppel v. Biovail Corp., 249 F.R.D. 111, 123 (S.D.N.Y. 2008) (denying motion for adverse inference instruction where, assuming plaintiff had demonstrated that relevant discoverable material was not properly preserved, "the plaintiff [was] unable to demonstrate that any single document, or even any type of document, that was destroyed would have been favorable to him"); Sovulj v. United States, No. 98-CV-5550 (FBR) (RML), 2005 WL 2290495, at *5 (E.D.N.Y. Sept. 20, 2005) ("To allow an adverse inference here would not have the effect of restoring the plaintiff to her position absent the destruction of the x-ray, but rather would prejudice the defendant by allowing plaintiff to profit from the destruction of the x-ray when no evidence has been presented to support such an inference of its contents.")

Here, Ms. Sawler—the very fact witness on which Plaintiff relies for the proposition that additional footage existed in the first place—also testified that (1) she personally observed Plaintiff enter and remain in his vehicle while it was connected to the tow truck (Tr. at 608:4-7, 636:16-637:13), and (2) she was asked by Defendants to get into the tow truck because they were concerned for her safety, and that she was in fact worried about her safety because Plaintiff was "very angry" (id. at 634:21-25, 635:6-12). An adverse inference instruction would have required the jury to believe Ms. Sawler's testimony that she recorded ten to fifteen minutes of footage, but disbelieve her testimony describing her own, personal recollection of what happened on the day in question and what that missing footage would have

shown. In other words, rather than corroborate Plaintiff's version of events, Ms. Sawler's testimony arguably contradicted it. Cf. Essenter v. Cumberland Farms, Inc., No. 09-CV-0539 (LEK) (DRH), 2011 WL 124505, at *5 (N.D.N.Y. Jan. 14, 2011) (granting motion for adverse inference instruction related to surveillance footage, and explaining that the plaintiff offered sufficient extrinsic evidence that footage would have been favorable to him in the form of testimony from sworn witnesses who personally observed conditions on the day in question). Similarly, the testimony of the tow truck driver, Mr. Rodriguez, did not corroborate Plaintiff's version of events. He testified that Plaintiff "came running out of the house, screaming," "jumped in the car to try and drive it off [the tow truck]," and, upon exiting the car, continued to yell and curse at the deputy sheriffs and tow truck operators. (Tr. at 644:8-13, 645:15-19.) Mr. Rodriguez also testified that once Officers Shammas and Castillo arrived at the scene, Plaintiff "got abusive with them," and yelled and cursed at them. (Id. at 647:13-648:10.) Under these circumstances, "an adverse inference here would not have the effect of restoring [] [P]laintiff to [his] position absent the destruction of the [recording], but rather would prejudice [Defendants] by allowing [P]laintiff to profit from the destruction of the [recording] when no evidence has been presented to support such an inference of its contents." Sovulj, 2005 WL 2290495, at *5.

Beyond this fatal defect in Plaintiff's spoliation theory, it is not even clear that more than thirty seconds of footage was successfully recorded in the first place. Cf. Riddle v. Liz Claiborne, Inc., No. 00-CV-1374 (MBM) (HBP), 2003 WL 21976403, at *2 (S.D.N.Y. Aug. 19, 2003) (denying motion for sanctions where the plaintiff failed to offer sufficient evidence "that the allegedly missing documents ever existed and, thus, . . . failed to offer any evidence suggesting that they were destroyed by [defendant]"). Although the trial witnesses'

accounts of the incident differed in many respects, not a single witness testified that he or she actually viewed any missing footage, either on the video recorder itself or on tape. Ms. Sawler testified that she believes she continued to record beyond the thirty seconds of footage now available, including interactions between Plaintiff and the deputy sheriffs, Plaintiff entering and exiting his car, and the tow truck leaving the scene with Plaintiff's vehicle in tow. (See Tr. at 628:21-630:2.) But Ms. Sawler also acknowledged that she did not verify that she had properly recorded the action on the day of the incident, and did not actually see (either personally or through the recorder) the physical altercation between Plaintiff and Defendants or Plaintiff's arrest. (Id. at 609:1-2, 631:6-22.) To direct the jury to conclude that the missing footage supported Plaintiff's version of the events and not any other version—where nobody actually verified whether that footage, in fact, ever existed, and where the footage, if it did exist, did not even cover the arrest and physical altercation—would go too far.[10]

As Plaintiff acknowledges, "considerable effort was devoted" by the parties and by the court in advance of trial to addressing the messy evidentiary issues related to the video footage and the various media that contained the footage. (Pl.'s Mem. at 20.) Ultimately, neither Defendants' eleventh-hour disclosure of the original recording, nor the trial testimony of Deputy Sheriff Bocanumenth, Mr. Primeau, Ms. Sawler, Mr. Rodriguez, or any other witness, altered the court's pre-trial determination that (1) Plaintiff could present evidence, including via expert witness, tending to show that additional footage of the incident was missing, but (2) a spoliation finding and an adverse inference instruction against Defendants was not warranted.

---

[10] The court understands Plaintiff's argument that the footage would at least be helpful to a factfinder in determining whether there was probable cause to arrest. The court does not find this argument compelling under the circumstances of this case.

b.    *Whether the Curative Instruction Was Improper*

Next, Plaintiff argues that the court "compounded" its error when it provided a curative

instruction during the parties' summations. (See Pl.'s Mem. at 23-24.) The court disagrees.

During summation, Plaintiff's counsel made the following statements to the jury:

> MS. CHAUDHRY: So we have seven different witnesses and
> seven different version [sic] of events. But what about the eighth
> witness? What about the video? Ah, the video. The video that
> recorded everything that happened at the car, everything that the
> defendants claim gave them probable cause to arrest Mitchell
> Stern. Everything happened at the car. And the video magically
> got erased after Sheriff Bocanumenth got his hands on it.
>
> *         *         *
>
> The tape isn't accused of falsely arresting Mitchell Stern. The tape
> didn't use unreasonable force against Mitchell Stern. The tape
> didn't injure Mitchell Stern. The tape is just a tape. Well, it was a
> tape until Deputy Sheriff Bocanumenth erased it, and now it's just
> a silent confession. The defendants have to prove to you that they
> had probable cause to arrest Mitchell Stern. They didn't have it.
> What they had was a tape of the actual events which Sheriff
> Bocanumenth erased.

(Tr. at 1103-23:1104:5, 1109:12-21.) At this point in the summation, Defendants objected, and

the court sustained the objection and directed counsel to sidebar, where the following colloquy

ensued:

> THE COURT: There's no evidence in the record that defendants
> erased that tape. If you say it one more time, you'll be subject to
> sanctions. That's my ruling and I will advise the jury if you do so.
>
> MS. NIMICK: Your Honor, we would just ask – she's now said it
> twice and I was trying not to interrupt her during her summation.
> She's now said it twice. We would ask that Your Honor give a
> curative instruction to the jury to advise them there is, in fact,
> nothing in the record to suggest that anyone who's at the table did
> anything to that tape.

28

THE COURT: I'll think about it.

MS. NIMICK: Thank you.

(Id. at 1109:22-1110:13.) Plaintiff's counsel thereafter continued her summation, without further interruption by the court.

After summations, and after the court provided its instructions to the jury, the parties again conferred at sidebar. At that time, Defendants renewed their request for "some sort instruction [sic] based on the plaintiff's summation concerning the video, that there is absolutely no evidence in the record to suggest that Deputy Bocanumenth had anything to do or any of the defendants, had anything to do with erasing it." (Id. at 1205:18-23.) In response to the court's inquiry of whether there was, in fact, "any evidence in this record that [Bocanumenth] doctored the video" (id. at 1206:1-2), Plaintiff's counsel argued that there was: "I think it's an inference that could be drawn from the circumstantial evidence that will support the jury reaching that conclusion, that this video was altered, that he was in possession of it, that he was the person responsible for caring for it for at least a certain period time after the incident" (id. at 1206:3-9). The court was not convinced, and further inquired: "Did he have the means to do it? Did you demonstrate in cross-examining him that he had means to go and take the—this cassette and doctoring the evidence that was in the possession of the Department of [] [I]nvestigation from 2010 until the other day?" (Id. at 1206:15-19.)

Ultimately, although the court hesitated at giving new instructions to the jury at the end of the case (id. at 1210:17-19), it explained that such an instruction was necessary:

> THE COURT: There had to be some sense of basic decency and fairness here as well. I've got a public servant here, counsel, who took his colleague to the hospital, and the idea that you would create this implication that he engaged in misfeasance without any evidence of it at all in this record is offensive, just offensive.

(Id. at 1210:20-25.) The parties thereafter conferred, and agreed on a proposed supplemental instruction, which the court recited to the jury:

> THE COURT: You have heard testimony regarding a videotape that was made on the date of this incident. You also heard testimony from plaintiff's expert that he believed the videotape had been altered or erased. I instruct you now that there is no direct evidence in the record to suggest that the tape, to the extent that it was altered or erased, was erased by any of these defendants. I further instruct you that you should disregard any statements made by plaintiff's counsel during her summation alleging that Deputy Bocanumenth had erased or altered the tape.

(Id. at 1215:15-25.)

Contrary to Plaintiff's representation in his post-trial memorandum, the court did not provide the instruction "in the midst of summations." (Pl.'s Mem. at 23; see also Pl.'s Reply at 8 n.5.) Rather, upon Defendants' objection during Plaintiff's summation—an objection that the court sustained—the court directed counsel to sidebar in order to discuss the issue. The court did not provide any instructions during Plaintiff's summation, and did not reprimand Plaintiff's counsel during her summation. In addition, because an adverse inference instruction was not warranted in this case, see supra Part II.C.3.a, the content of the curative instruction did not, as Plaintiff argues, "disregard[] the applicable law concerning adverse inferences." (Pl.'s Mem. at 23.) And, contrary to Plaintiff's argument, the instruction itself did not irreparably prejudice him; rather, the court reiterated that the jury heard testimony during the trial tending to show that additional footage was missing, but cured the misrepresentation made by Plaintiff's counsel that the jury could infer that Deputy Bocanumenth had intentionally erased or altered the tape.[11] This

---

[11] Plaintiff further argues that the court had previously ruled that he could introduce his expert's testimony, and then could "argue what you want to argue and the defense can argue what it wants to argue." (Pl.'s Reply at 9 (quoting Tr. at 665-66).) The court made this statement midway through Plaintiff's case, before the testimony of Mr. Primeau, and before the testimony of the four Defendants, including Deputy Sheriff Bocanumenth. The problem is that Plaintiff subsequently failed to offer any evidence to support the statements made by counsel during her summation that Bocanumenth erased the recording. The court did not preclude Plaintiff from asking the jury to reach inferences supported by the evidence—for example, Plaintiff could have argued that Bocanumenth was

instruction was proper: There was no evidence in the record that Bocanumenth engaged in misconduct, destroyed the tape intentionally, or acted in bad faith. There was no evidence that Bocanumenth—in the twice-repeated words of Plaintiff's counsel—"erased" the tape.

## D.    Whether the Verdict Was Against the Weight of the Evidence

Finally, Plaintiff argues that the jury's verdict was against the weight of the evidence, and he requests a new trial pursuant to Rule 59(a). (Pl.'s Mem. at 24-25.) Defendants counter that the evidence introduced at trial supported the jury's verdict. (Defs.' Mem. at 14-15.)

Although Plaintiff may view the trial record as "weigh[ing] strongly" in his favor (Pl.'s Mem. at 24), the court, having presided over the trial, views the record more neutrally (at best). The fact witnesses from each side (including third-party witnesses Ms. Sawler and Mr. Rodriguez) testified to diverging accounts of the events of December 16, 2009, and the jury was asked either to credit Plaintiff's version of the events (supported by the testimony of his family members and expert witnesses), or to credit Defendants' version of the events (supported by the tow truck operator witnesses).[12] Throughout the trial, the jury appeared engaged, and, based on the length of its deliberations and the several notes that it sent to the court requesting record materials and further instructions, it appears that the jury took its role as factfinder seriously. The jury did not have an easy task—it was faced with widely deviating factual accounts of the interactions between Plaintiff and Defendants, as well as complex medical and

_____

negligent, and pointed to the fact that he testified that he could not recall how this particular recording arrived at the Department of Finance. As for the statement made by Defendants' counsel during her summation—that there was "nothing in the record to suggest that [Defendants] in any way tampered with, erased or in fact, even watched that videotape" (Pl.'s Reply at 9 n.6 (quoting Tr. at 1143:3-5))—it was supported by the evidence (or, more specifically, the lack of evidence) introduced at trial. It was not the court's instruction that precluded the jury from reaching the inference that Plaintiff sought, but rather, Plaintiff's inability to offer any evidence that would have supported the inference that Bocanumenth intentionally erased a portion of the recording.

[12] Plaintiff argues that the Defendants testified inconsistently with one another. (Pl.'s Mem. at 25.) That may be so. But, considering that the incident in question occurred almost six years prior to the trial in this action, the court does not view these inconsistencies as requiring it (or the jury) to disbelieve Defendants' testimony or their general narrative of events, to which each Defendant testified consistently.

31

other evidence presented through expert witnesses. The court sees no reason to disturb the jury's factual determination in this case. Accordingly, the court denies Plaintiff's request for a new trial on the ground that the jury's verdict was against the weight of the evidence.

## III. CONCLUSION

For the foregoing reasons, Plaintiff's renewed motion for judgment as a matter of law, or, in the alternative, motion for a new trial, is DENIED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
October 21, 2015

NICHOLAS G. GARAUFIS
United States District Judge